

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-20-2005

# Jacobs v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 01-9000

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Jacobs v. Horn" (2005). *2005 Decisions*. Paper 1535.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1535

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 01-9000
_____

DANIEL JACOBS,
                                    Appellant

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections;
CONNER BLAINE, JR., Superintendent of the State
Correctional Institution,
Greene County; JOSEPH P. MAZURKIEWICZ,
Superintendent of the
State Correctional Institution at Rockview

_____

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil No. 99-cv-01203)
District Judge:  Honorable James M. Munley

_____

Argued June 8, 2004

Before:  SCIRICA, Chief Judge, McKEE and FUENTES,
Circuit Judges.

(Filed January 20, 2005)
_____

Stuart B. Lev, Esquire (Argued)
Matthew C. Lawry, Esquire
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106
          *Attorneys for Appellant*

Jonelle H. Eshbach, Esquire (Argued)
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120
          *Attorney for Appellees*

## OPINION OF THE COURT
_____

FUENTES, <u>Circuit Judge</u>.

Pennsylvania inmate Daniel Jacobs was sentenced to death for murdering his girlfriend Tammy Mock and to life in prison for murdering their baby Holly Jacobs. On federal habeas review, the District Court concluded that Jacobs' trial counsel rendered ineffective assistance during the penalty phase for failing to investigate and present mitigating evidence

2

concerning Jacobs' cognitive and emotional impairments and his childhood and family background. The District Court conditionally granted a writ of habeas corpus to allow the Commonwealth to resentence Jacobs. The District Court rejected each of Jacobs' remaining challenges to his convictions and sentences.

Jacobs now appeals from the District Court's denial of federal habeas relief on several of his claims challenging his convictions.[1]

For the following reasons, we will reverse the District Court's denial of habeas corpus relief on Jacobs' claim that trial counsel rendered ineffective assistance during the guilt phase by failing to adequately investigate, prepare, and present mental health evidence in support of his diminished capacity defense. We will affirm the District Court's denial of habeas corpus relief on each of Jacobs' remaining claims.

## I. BACKGROUND

Daniel Jacobs and his girlfriend Tammy Mock lived in an apartment in York, Pennsylvania, with their seven-month-old daughter Holly Jacobs. In February 1992, York police received a telephone call from Jacobs' mother, Delois Jacobs, in Virginia, who under a fictitious identity asked them to check on Tammy

---

[1]The Commonwealth does not appeal from the District Court's decision to grant habeas corpus relief on Jacobs' claim of ineffective assistance of counsel at the penalty phase.

and Holly. This telephone call prompted the police to check the apartment, where they found Tammy and Holly dead in the bathtub. Tammy had been stabbed more than 200 times. Holly died from drowning and had no stab wounds or evidence of trauma. The police tracked down Delois, who gave a statement that Jacobs had admitted in telephone conversations that he had killed both Tammy and Holly. Delois also testified at a preliminary hearing that Jacobs admitted killing Tammy and Holly.

In preparation for trial, counsel consulted with Dr. Robert Davis, a psychiatrist with a clinical and forensic practice. Dr. Davis conducted a mental health evaluation of Jacobs regarding his criminal responsibility and competency to stand trial. Counsel did not inform Dr. Davis that Jacobs was subject to the death penalty, and did not provide him with materials concerning Jacobs' background or the background of the offenses. Dr. Davis reported orally to counsel that he found no evidence of a major mental illness. At counsel's request, Dr. Davis did not prepare a written report.

Jacobs was tried before a jury in the York County Court of Common Pleas for the first degree murders of Tammy and Holly. At trial, Jacobs denied killing Holly. He testified that Tammy killed Holly and that he stabbed Tammy to death after losing control at the sight of Holly dead in the bathtub. He presented a heat of passion and diminished capacity defense, i.e., that he was incapable of forming a specific intent to kill her given his mental state at the time of the killing. Delois testified that Jacobs admitted in his telephone calls that he killed Tammy, but that she could not remember whether he also admitted that

4

he killed Holly.  The Commonwealth presented Delois' pretrial statements that Jacobs admitted to killing both Tammy and Holly.

The jury found Jacobs guilty of murder in the first degree of both Tammy and Holly.  Jacobs was sentenced to death for murdering Tammy and to life in prison for murdering Holly.  On direct appeal, the Pennsylvania Supreme Court affirmed the judgments of sentence. Commonwealth v. Jacobs, 639 A.2d 786 (Pa. 1994) ("Jacobs I").  Jacobs pursued state collateral relief under Pennsylvania's Post Conviction Relief Act ("PCRA").  The PCRA court conducted hearings and denied all relief in an oral decision rendered June 13, 1997.  The Pennsylvania Supreme Court affirmed.  Commonwealth v. Jacobs, 727 A.2d 545 (Pa. 1999) ("Jacobs II").

Jacobs then filed the current habeas corpus petition in the District Court, in which he presented fifteen claims for relief.[2] Without conducting an evidentiary hearing, the District Court granted habeas relief as to Jacobs' claim of ineffective assistance of counsel during the penalty phase for failing to investigate and present mitigating evidence concerning Jacobs' cognitive and emotional impairments, and evidence that he suffers from the effects of a traumatic and neglectful childhood.

_____

[2]The District Court's opinion enumerates the claims Jacobs presented in his habeas corpus petition. See Jacobs v. Horn, 129 F. Supp. 2d 390, 396-97 (M.D. Pa. 2001). Jacobs challenges the District Court's denial of only four of those claims in this appeal, as set forth fully infra.

5

Jacobs v. Horn, 129 F. Supp. 2d 390, 405-08 (M.D. Pa. 2001) ("Jacobs III"). According to the District Court, if counsel had investigated Jacobs' background and childhood, he would have discovered the following facts. Jacobs' mother Delois drank heavily while she was pregnant with Jacobs. His alcoholic father severely beat her in the presence of their children. After Delois left Jacobs' father when Jacobs was very young, she was involved in relationships with several men who drank heavily and abused her, as well as Jacobs. Jacobs' older brother also beat him constantly and stabbed him on one occasion. When he was about six years old, Jacobs suffered brain damage due to a car accident. As a young teenager, Jacobs often acted like a child and required his mother's assistance in getting dressed. Relatives who visited the home sometimes found Jacobs sitting at home undressed, dirty, and unkempt. One of Delois' boyfriends, with whom she was involved for about ten years, would become intoxicated with Jacobs then fly into a rage and beat him. As Jacobs grew older, he attempted to assist his mother by working but was unable to find and maintain employment.

Based on counsel's failure to discover and present mitigating evidence[3] at the penalty phase, the District Court conditionally granted the writ of habeas corpus to allow the

---

[3]The District Court also relied on mental health evidence demonstrating that Jacobs suffers from mild mental retardation, organic brain damage, and other mental and emotional impairments. See Jacobs III, 129 F. Supp. 2d at 402-03. We discuss this evidence in detail infra.

6

Commonwealth to resentence Jacobs for murdering Tammy. Id. at 423. The District Court found each of Jacobs' remaining challenges to his convictions either lacking in merit or procedurally barred from federal habeas review. Jacobs timely appealed. The District Court issued a certificate of appealability and stayed its order pending appeal.

## II.    JURISDICTION AND STANDARDS OF REVIEW

Our jurisdiction is based on 28 U.S.C. §§ 1291 and 2253. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254. Because the District Court ruled on Jacobs' habeas corpus petition without conducting an evidentiary hearing, our review of the District Court's decision is plenary. See Marshall v. Hendricks, 307 F.3d 36, 50 (3d Cir. 2002).

We apply the same standards as the District Court, as mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

7

Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Marshall, 307 F.3d at 50. A federal habeas court must presume that a state court's findings of fact are correct. See 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. Id.

A state court decision is contrary to Supreme Court precedent under § 2254(d)(1) where the state court reached a "'conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Marshall, 307 F.3d at 51 (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). A state court decision is an unreasonable application under § 2254(d)(1) if the court "identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."

8

Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002) (citing Williams, 529 U.S. at 407). The unreasonable application test is an objective one – a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003); Gattis, 278 F.3d at 228.

AEDPA's deferential standards of review do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002). In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review. Id. Prior to AEDPA, federal habeas courts conducted a de novo review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). In such circumstances, the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence under § 2254(e)(1). Id.

## III.    DISCUSSION

On appeal, Jacobs challenges the District Court's denial of habeas corpus relief on the following claims:[4]

---

[4]The District Court issued a certificate of appealability authorizing Jacobs to pursue seven specific issues on appeal. See 28 U.S.C. § 2253(c)(3). Jacobs has elected to pursue only

9

(1)     Trial counsel was ineffective for failing to adequately investigate, prepare, and present mental health evidence in support of the diminished capacity defense to the charges of first degree murder.

(2)     Appellant's constitutional rights to due process and the effective assistance of counsel were violated where the trial court failed to properly instruct the jury on Pennsylvania's corpus delicti rule, trial counsel failed to object or request an appropriate instruction, and where the Commonwealth's evidence was insufficient, under Pennsylvania law, to prove that Holly Jacobs was killed by criminal means.

(3)     Appellant was denied his right to effective assistance of counsel as a result of trial counsel's failure to investigate and present evidence that Mr. Jacobs' mother had a long history of alcoholism and was intoxicated when the purported admissions were made.

---

four of them on appeal.

10

(4)      Trial counsel was ineffective for failing to inquire concerning racial bias among members of the jury, where the entire venire was white and the case involved the murder of a white female teenager and child by her African-American boyfriend.

Appellant's Opening Br. at ii-iv. We address each claim separately.

##### A.      Ineffective Assistance of Counsel During the Guilt Phase for Failing to Investigate and Discover Mental Health Evidence

We begin with Jacobs' claim that trial counsel rendered ineffective assistance during the guilt phase by failing to investigate and present mental health evidence for the purpose of supporting his diminished capacity defense.[5] Jacobs testified that on the day of the killings, he and Tammy argued, fought, and cut each other. According to Jacobs, after fighting with Tammy, he helped her into the bathtub, brought the baby into the bathroom, then left the bathroom. When he returned to the

---

[5]Jacobs exhausted this claim by presenting it in his PCRA petition and on PCRA appeal. The Pennsylvania Supreme Court rejected this claim on the merits. See Jacobs II, 727 A.2d at 548-49. Therefore we apply the AEDPA standard of review to this claim.

bathroom a short time later, he saw the baby dead in the bathtub, lost control, and stabbed Tammy repeatedly. Based on Jacobs' testimony, defense counsel presented a heat of passion and diminished capacity defense, asserting that Jacobs lacked the specific intent to kill Tammy Mock.[6]

In preparation for Jacobs' PCRA appeal, Dr. Julie Kessel, a licensed and certified psychiatrist familiar with forensic mental health issues, conducted a forensic psychiatric evaluation of Jacobs. (Kessel Affidavit ¶¶ 1-2). Dr. Kessel reported that Jacobs suffers from a number of mental health deficits, including mild mental retardation, organic brain damage, and schizoid personality disorder, and was a child witness and victim of abuse, neglect, and drug and alcohol abuse. (Id. ¶¶ 3-5). According to Dr. Kessel, the combination of these impairments substantially hindered Jacobs' mental, emotional, and cognitive capacities. (Id. ¶ 5). In Dr. Kessel's opinion, at the time of the crimes, Jacobs' capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired. (Id. ¶ 12). His impairments also substantially diminished his capacity to formulate the specific intent to kill. (Id. ¶ 14). Dr. Kessel concluded that Jacobs "did not in fact have the specific intent to kill Ms.

---

[6]In Pennsylvania, the diminished capacity defense requires a defendant to admit general culpability. See Commonwealth v. Legg, 711 A.2d 430, 433 (Pa. 1998). Because Jacobs denied killing Holly, the diminished capacity defense was unavailable as to the baby's murder. See Commonwealth v. Johnson, 815 A.2d 563, 578 (Pa. 2002).

Mock." (Id. ¶ 14).

Dr. Patricia Fleming, a licensed clinical psychologist and neuropsychologist, also evaluated Jacobs and reported that he "is seriously psychologically, emotionally and cognitively impaired." (Fleming Affidavit ¶ 4). After conducting a number of psychological and neuropsychological tests, Dr. Fleming reported that Jacobs suffers from mild mental retardation, brain damage, and cognitive and emotional impairments. (Id. ¶¶ 9, 13). At the time of the offenses, Dr. Fleming stated, Jacobs' disturbances "substantially impaired [his] capacity to appreciate the consequences of his conduct or to conform his conduct to the requirements of the law." (Id. ¶ 13). In particular, his "mental retardation, brain damage and other mental health and cognitive impairments significantly diminish[ed] his capacity to premeditate and form a specific intent to kill." (Id. ¶ 14). Dr. Fleming concluded that the facts "support the conclusion that [Jacobs] did not have the capacity to form the specific intent to kill." (Id.).

As described previously, trial counsel pursued a heat of passion and diminished capacity defense to the murder of Tammy Mock. Beyond his oral consultation with Dr. Davis, however, counsel took no further steps to discover evidence of Jacobs' mental retardation, brain damage, or other impairments. Trial counsel was thus unable to support Jacobs' diminished capacity defense with psychiatric evidence establishing that he suffered from any mental disorders which prevented him from formulating the specific intent to kill. Apparently the only evidence of heat of passion or diminished capacity presented at the guilt phase was Jacobs' own testimony that he "lost it" and

13

stabbed Tammy repeatedly upon seeing their baby drowned in the bathtub. Jacobs claims that trial counsel's failure to investigate, discover, and present mental health evidence constitutes ineffective assistance in violation of the Sixth Amendment.

Sixth Amendment claims of ineffective assistance of counsel are governed by the familiar two-prong test of Strickland v. Washington, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687; see Williams, 529 U.S. at 390-91.

Under Strickland's first prong, Jacobs must show that counsel's performance was deficient. The proper standard for attorney performance is that of "reasonably effective assistance" – Jacobs must show that trial counsel's representation fell below an objective standard of reasonableness considering all the circumstances. Strickland, 466 U.S. at 687-88. Counsel's reasonableness must be assessed on the facts of the particular case, viewed as of the time of counsel's conduct. Id. at 689. In the context of ineffective assistance based on counsel's failure

14

to investigate, the court must determine whether counsel exercised "reasonable professional judgment." Wiggins, 539 U.S. at 522-23.

In Pennsylvania, when asserting a diminished capacity defense, "a defendant attempts to negate the element of specific intent to kill and, if successful, first degree murder is reduced to third degree murder." Commonwealth v. McCullum, 738 A.2d 1007, 1009 (Pa. 1999). According to the Pennsylvania Supreme Court, "[d]iminished capacity is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." Commonwealth v. Cuevas, 832 A.2d 388, 393 (Pa. 2003) (citing Commonwealth v. Zettlemoyer, 454 A.2d 937, 943 (Pa. 1982)).

The specific question posed here is whether counsel exercised reasonable professional judgment in failing to investigate further and discover Jacobs' mental retardation, brain damage, and other impairments as evidence to support the diminished capacity defense. To his credit, counsel did ask Dr. Davis to evaluate Jacobs. (Davis Affidavit ¶ 2). Counsel did not, however, inform Dr. Davis that the Commonwealth was seeking the death penalty, nor did he provide Davis with any background information concerning the crimes or Jacobs' history. (Id. ¶¶ 2, 3). According to Dr. Davis, if he had known that this was a capital case, he would have automatically requested testing for brain damage or other impairments that are not readily apparent from a standard evaluation. (Id. ¶ 6). Dr. Davis reported orally to counsel that he did not find any evidence of a major mental illness. (Id. ¶ 4). Upon receipt of

15

this report, counsel chose not to investigate further, although he presented the diminished capacity defense at trial. Counsel did not question any of Jacobs' family members or friends regarding his childhood, background, or mental health history, or obtain any medical records demonstrating mental deficiencies.

At the time counsel decided not to investigate further, he knew or should have known from Jacobs' behavior and from his interactions with Jacobs that he should initiate some investigation "of a psychological or psychiatric nature." (PCRA Hearing Tr. 5/29/97 at 29:24). Counsel knew that Jacobs, a young man with no criminal history or history of violence, admitted to stabbing his girlfriend more than 200 times. Counsel knew that Jacobs faced the death penalty, yet did not inform Dr. Davis that the Commonwealth was seeking the death penalty, nor did he provide Davis with any background information concerning the crimes or Jacobs' history. Counsel interviewed Jacobs' mother before trial, but did not ask her any questions regarding Jacobs' mental health history, childhood, or background. In light of all that was known or made available to counsel, we conclude that Jacobs has satisfied the first prong of the Strickland test. He has demonstrated that counsel did not exercise reasonable professional judgment in failing to investigate further and discover evidence of Jacobs' mental retardation, brain damage, and other impairments that could have prevented him from forming the specific intent to kill Tammy Mock.

The District Court was persuaded that counsel's performance was not deficient in this regard. See Jacobs III, 129 F. Supp. 2d at 412-13. The District Court relied on two

16

cases from other circuits that the District Court interpreted as holding that counsel is not required to investigate further unless a psychiatric evaluator indicates further information is needed. Id. One of these, on which the Commonwealth relies heavily, is Hendricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995).

In Hendricks, counsel hired a psychiatrist who met with the defendant for about four and one-half hours and found no evidence to support a "mental defense." Id. at 1037. The psychiatrist posited that psychological testing might be useful and suggested that counsel consult a psychologist. A psychologist then interviewed the defendant for about fifteen hours, ran several psychological tests, reviewed records regarding the crime and the defendant's life history, and found no evidence to support a mental defense. Counsel relied on the experts' opinions and decided not to explore further or present a mental defense. Id.

The Ninth Circuit ruled that Hendricks' attorneys had discharged their duty to seek out a psychiatric evaluation. Id. at 1038-39. The Ninth Circuit further ruled that counsel "fell within the broad range of presumptively acceptable conduct by hiring two mental health professionals to investigate potential mental defenses and then relying on their shared, unqualified conclusion that there was no basis for a mental defense." Id. at 1039. Attorneys, the court opined, cannot be forced to "second-guess their experts." Id.

Hendricks is dissimilar to Jacobs' case in two significant respects. First, Hendricks involved material facts vastly different from those in Jacobs' case. Hendricks' attorneys

17

employed both a psychiatrist and a psychologist who evaluated the defendant separately and extensively, and with the benefit of background information. The experts agreed that no evidence existed to support a diminished capacity defense. In Jacobs' case, while counsel asked Dr. Davis to evaluate Jacobs, there is no information to indicate that Dr. Davis' evaluation was sufficiently extensive. His affidavit states only that he "examined Mr. Jacobs to determine if he had a major mental illness or other impairment that would render him incompetent to stand trial or that would negate or reduce his criminal responsibility." (Davis Affidavit ¶ 4). In conducting his evaluation, Dr. Davis was not aware that Jacobs was subject to the death penalty, nor was Dr. Davis privy to any background information whatsoever. As a result, no psychological testing occurred. In turn, counsel failed to discover Jacobs' mental retardation, brain damage, and other emotional and mental impairments.

We also find the legal issue presented in Hendricks unlike the one presented in Jacobs' case. The question raised in Hendricks was whether counsel was ineffective in deciding not to investigate more extensively before making a strategic choice not to present a diminished capacity defense at all. The question raised here is whether counsel was ineffective by failing to investigate and discover evidence to support the defense he pursued. Although subtle, the distinction is significant. An attorney's strategic choices made after a thorough investigation "are virtually unchallengeable." Strickland, 466 U.S. at 690-91. Hendricks reiterates and applies this well established principle. Counsel's failure to investigate adequately and discover evidence to support his strategy of choice is an entirely different

18

question, one which <u>Hendricks</u> does not address.  <u>See</u> <u>Wiggins</u>, 539 U.S. at 523.  In short, <u>Hendricks</u> is inapposite and does not affect our conclusion that Jacobs has satisfied the first prong of <u>Strickland</u> by demonstrating that his attorney failed to exercise reasonable professional judgment in this regard.[7]

---

[7]Our dissenting colleague suggests that counsel performed reasonably by relying on Dr. Davis' oral report in deciding not to inquire further into Jacobs' mental health.  The dissent correctly notes that Dr. Davis did not state that he was incapable of forming a conclusion on the information available to him, nor did he ask for any additional information.  Several other "highly relevant facts" prevent us from agreeing, however.  It is undisputed that Dr. Davis was completely unaware that Jacobs was subject to the death penalty.  (Davis Affidavit ¶¶ 2, 4, 5, 7.)  At the time he offered his opinion, Dr. Davis was unaware that Tammy Mock had been stabbed more than 200 times because he was not provided with the autopsy report or other background materials concerning the killings, other than "a police report with some information concerning the alleged facts of the offense."  (<u>Id.</u> ¶¶ 3, 12.)  Dr. Davis was unaware that the killings occurred after a heated argument between Jacobs and Mock.  (<u>Id.</u> ¶ 12.)  He knew nothing about Jacobs' background, such as his lack of a criminal history or history of violent behavior.  (<u>Id.</u> ¶¶ 3, 12.)  As Dr. Davis later opined, these facts alone "suggest that Mr. Jacobs was highly emotionally disturbed at the time of the offense," and that he was "overcome by a powerful and uncharacteristic emotional reaction."  (<u>Id.</u> ¶ 12.)  In our view, in light of all the circumstances present in this capital case, it was patently unreasonable for counsel to rely solely on Dr. Davis'

19

In addition to establishing that his attorney performed deficiently, Jacobs must demonstrate that he was prejudiced by counsel's error. See Strickland, 466 U.S. at 692. The prejudice component requires Jacobs to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Jacobs need not show that counsel's deficient performance "more likely than not altered the outcome in the case" – rather, he must show only "a probability sufficient to undermine confidence in the outcome." Id. at 693-94. This standard is not "'a stringent one.'" Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001) (quoting Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)).

We are persuaded that Jacobs has satisfied Strickland's prejudice prong. As described above, Dr. Kessel conducted a forensic psychiatric evaluation of Jacobs. (Kessel Affidavit ¶¶ 1-2). According to Dr. Kessel, the combination of Jacobs' mental health impairments substantially impaired Jacobs' mental, emotional, and cognitive capacities. (Id. ¶ 5). In Dr. Kessel's opinion, Jacobs "did not in fact have the specific intent to kill" Tammy Mock. (Id. ¶ 14). Dr. Fleming also evaluated Jacobs and concluded that Jacobs' disturbances "substantially

---

uninformed opinion in deciding not to investigate Jacobs' mental health history further. The unreasonableness of counsel's decision is compounded by the fact that he pursued a diminished capacity defense without any expert evidence to support it, as expressly required by Pennsylvania law. See Cuevas, 832 A.2d at 393.

20

impaired [his] capacity to appreciate the consequences of conduct or to conform his conduct to the requirements of the law." (Fleming Affidavit ¶ 13). Dr. Fleming also stated that Jacobs' "mental retardation, brain damage and other mental health and cognitive impairments significantly diminish[ed] his capacity to premeditate and form a specific intent to kill." (Id. ¶ 14). According to Dr. Fleming, the facts "support the conclusion that he did not have the capacity to form the specific intent to kill." (Id.).

In Pennsylvania, diminished capacity "is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." Cuevas, 832 A.2d at 393. Both Drs. Kessel and Fleming have expressed a willingness to testify that Jacobs suffered from mental disorders that deprived him of the capacity to form the specific intent to kill Tammy Mock. In our view, Jacobs' case is the specific type in which the diminished capacity defense as to the murder of Tammy Mock is appropriate. Moreover, we are persuaded that if the jury had heard Drs. Kessel and Fleming testify based on their extensive evaluations, there is a reasonable probability that the jury would have found Jacobs guilty of third degree murder, not first degree murder, of Tammy Mock.[8]

_____

[8]We are aware, as our dissenting colleague notes, that no court heretofore has decided whether Jacobs has satisfied the prejudice prong of Strickland. Both the Pennsylvania Supreme Court and the District Court ruled that trial counsel did not

21

For these reasons, we conclude that Jacobs has demonstrated that trial counsel rendered ineffective assistance in violation of the Sixth Amendment. Under AEDPA, however, our determination that the Pennsylvania Supreme Court erroneously rejected this claim on the merits does not necessarily entitle Jacobs to federal habeas relief. Rather, AEDPA requires Jacobs to demonstrate that the Pennsylvania Supreme Court's rejection of this claim either is contrary to, or involved an objectively unreasonable application of, Strickland.

---

perform deficiently. Thus, neither of those courts was required to decide whether Jacobs suffered prejudice. Even so, the issue of prejudice was properly before each of those courts, as were the affidavits of Drs. Kessel and Fleming supporting Jacobs' assertion of prejudice. The Commonwealth could have challenged Jacobs' expert evidence by submitting expert evidence of its own. It appears that the Commonwealth made the strategic choice not to submit such evidence, a choice we do not question. Regardless, because the prejudice determination here is purely a legal one, we need not remand to the District Court to make such a determination in the first instance or to allow the Commonwealth a second opportunity to challenge Jacobs' expert evidence. We emphasize that Jacobs need not establish his diminished capacity defense conclusively for the purpose of demonstrating a Sixth Amendment violation. Rather, as we have explained, he is required to show only a reasonable probability that the outcome of the proceedings would have been different if trial counsel had presented evidence of Jacobs' mental retardation, organic brain damage, and other mental deficiencies. See Strickland, 466 U.S. at 694.

22

See 28 U.S.C. § 2254(d)(1); Wiggins, 539 U.S. at 520-21; Gattis, 278 F.3d at 228.

In denying this claim, the Pennsylvania Supreme Court did not cite Strickland, nor did it apply Strickland's two-part test. Rather, the Pennsylvania Supreme Court applied the following standard:

> With respect to claims of ineffective assistance of trial counsel, Appellant is required to establish that the claim has arguable merit; that trial counsel had no reasonable basis for proceeding as he did; and that the alleged ineffectiveness of counsel so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

Jacobs II, 727 A.2d at 547-48 (citing Commonwealth v. Collins, 687 A.2d 1112, 1113 (Pa. 1996)). The Pennsylvania Supreme Court then concluded:

> Based on the results of the psychiatric evaluation, and given Appellant's trial testimony, it is clear that trial counsel did investigate and pursue a diminished capacity defense on behalf of Appellant to the best of his ability. Accordingly, as trial counsel had a reasonable basis for proceeding as he did, he cannot be deemed ineffective.

Jacobs II, 727 A.2d at 549.

The Pennsylvania Supreme Court's rejection of this claim is based solely on the finding that counsel had a reasonable basis

23

for deciding not to investigate further. In making this finding, the Pennsylvania Supreme Court placed great weight on the fact that Dr. Davis orally reported that he found no evidence of a major mental illness negating or reducing criminal liability. Apparently, the Pennsylvania Supreme Court disregarded counsel's failure to provide Dr. Davis with the necessary information to conduct a proper evaluation, as well as several other highly relevant facts known to counsel at the time he decided not to investigate further.

In our view, the Pennsylvania Supreme Court's decision, based on a single factor to the exclusion of other relevant factors, involved an unreasonable application of Strickland.[9] Strickland teaches that a court deciding any ineffectiveness claim must "determine whether, in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690 (emphasis added). Specifically, in an ineffectiveness claim challenging counsel's decision not to investigate, Strickland mandates that counsel's decision "must be directly assessed for reasonableness in all the circumstances." Id. at 691.

---

[9]We have previously ruled that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to Strickland. See Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000). Thus, under § 2254(d)(1), the relevant question here is whether the Pennsylvania Supreme Court's decision involved an unreasonable application of Strickland.

24

Since <u>Strickland</u>, the United States Supreme Court has repeatedly emphasized the necessity of assessing an ineffectiveness claim in light of all the circumstances. <u>See</u> <u>Wiggins</u>, 539 U.S. at 533; <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 478 (2000); <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 384 (1986). We too have underscored the importance of the circumstance-specific inquiry mandated by <u>Strickland</u>. <u>See</u> <u>Lewis v. Johnson</u>, 359 F.3d 646, 659 (3d Cir. 2004); <u>Rompilla v. Horn</u>, 355 F.3d 233, 257 (3d Cir.), <u>cert.</u> <u>granted</u>, 125 S. Ct. 27 (2004); <u>Duncan v. Morton</u>, 256 F.3d 189, 201 (3d Cir. 2001); <u>Berryman v. Morton</u>, 100 F.3d 1089, 1101 (3d Cir. 1996); <u>Frey v. Fulcomer</u>, 974 F.2d 348, 358 (3d Cir. 1992). These cases amply demonstrate that an assessment of the reasonableness of counsel's performance under <u>Strickland</u> requires consideration of all the circumstances. Here, the Pennsylvania Supreme Court did not adhere to <u>Strickland</u>'s clear mandate. In light of all the relevant facts described above, we are constrained to conclude that the Pennsylvania Supreme Court's decision involved an unreasonable application of <u>Strickland</u>.

For these reasons, we conclude that trial counsel rendered ineffective assistance in violation of the Sixth Amendment at the guilt phase by failing to investigate and present evidence showing that Jacobs suffered from mental retardation, organic brain damage, and other emotional and mental impairments that prevented him from forming the specific intent to kill Tammy Mock. We further conclude that the Pennsylvania Supreme Court's rejection of this claim on the merits involved an unreasonable application of <u>Strickland</u>. Accordingly, we will reverse the District Court's decision denying federal habeas relief on this claim, and will remand with instructions to grant

25

the writ.[10]

While our decision invalidates Jacobs' conviction for the first degree murder of Tammy Mock, the question remains whether counsel's ineffectiveness also invalidates Jacobs' conviction for murdering Holly. As noted previously, the diminished capacity defense requires a defendant to admit general culpability. See Commonwealth v. Legg, 711 A.2d 430, 433 (Pa. 1998). Because Jacobs denied killing Holly, the

---

[10]Our decision is not influenced by Jacobs' argument that the District Court's decision denying habeas relief based on counsel's conduct during the guilt phase is inconsistent with its grant of relief on his claim of ineffective assistance during the penalty phase. During the guilt phase, the defendant must establish that he "suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." See Cuevas, 832 A.2d at 393. Diminished capacity evidence at the guilt phase is limited to expert psychiatric testimony demonstrating that the defendant was unable to form the specific intent to kill. See McCullum, 738 A.2d at 1010. The jury's function during the sentencing phase is to weigh mitigating factors against aggravating factors. See 42 Pa. Cons. Stat. Ann. § 9711(c). At sentencing, the jury must consider "evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense" and must weigh mitigating factors against aggravating factors. 42 Pa. Cons. Stat. Ann. §§ 9711(c), (e)(8). In short, counsel's duties at the guilt phase and his duties at the sentencing phase differ significantly.

26

diminished capacity defense was unavailable as to the baby's murder. See Commonwealth v. Johnson, 815 A.2d 563, 578 (Pa. 2002). That is because, as Jacobs acknowledges, a diminished capacity defense is inconsistent with an assertion of innocence.[11] See Commonwealth v. Williams, 846 A.2d 105, 111 (Pa. 2004).

Nonetheless, Jacobs argues that a diminished capacity defense to the murder of Holly would not be inconsistent in his case. Jacobs cites Legg for the proposition that "a diminished capacity defense is available where the defendant admits to facts which may cause a jury to hold him responsible for the killing to some degree." (Appellant's Supplemental Mem. at 2). Jacobs argues that because his trial counsel conceded in closing argument that Holly's death could have been accidental and that the jury could have found Jacobs criminally responsible for her death, a diminished capacity defense would not have been inconsistent with his testimony that he did not kill Holly.

To the extent that Jacobs argues that his case is similar to

---

[11]See Appellant's Supplemental Mem. at 2. After oral argument, Jacobs' counsel requested permission to file a supplemental memorandum addressing whether counsel's ineffectiveness undermined Jacobs' conviction for murdering Holly. The Commonwealth in turn requested permission to file a supplemental memorandum responding to Jacobs' supplemental memorandum. We granted these requests and have considered the parties' supplemental memoranda in rendering our decision.

Legg, we disagree. There, Betty Legg was convicted of the first degree murder of her husband and was sentenced to life in prison. Legg, 711 A.2d at 432. Legg expressly admitted that she shot and killed her husband but maintained that the shooting was accidental. Id. at 435. Counsel did not present evidence of Legg's diminished capacity. The Pennsylvania Supreme Court found that a diminished capacity defense would not have conflicted with Legg's position that the shooting was accidental, and ruled that counsel rendered ineffective assistance by failing to present such evidence. Id. at 435.

Here, Jacobs has consistently denied killing Holly and in fact blamed her death on Tammy. Under Pennsylvania law, a diminished capacity defense was simply unavailable as to Holly's death because Jacobs maintained his innocence. We find nothing in Legg suggesting otherwise. In fact, Legg distinguishes Betty Legg's situation from others in which the defendants maintained their innocence. See id. at 434-35 (distinguishing Commonwealth v. Cross, 634 A.2d 173 (Pa. 1993), and Commonwealth v. Mizell, 425 A.2d 424 (Pa. 1981)). Because the sole issue at trial was Betty Legg's mental state at the time of the shooting, not whether she killed her husband, Legg's counsel should have raised a diminished capacity defense to negate the specific intent to kill. See Legg, 711 A.2d at 435.

Moreover, we do not read defense counsel's closing argument as a concession that Jacobs could be criminally responsible for Holly's death. Rather, defense counsel acknowledged that there was no direct evidence that Tammy Mock murdered Holly and stated that "we don't know" how

28

Holly drowned. (Trial Tr., Vol. IV, 9/17/92 at 735:9-736:4). Regardless, counsel emphasized, Jacobs was "most sure" that he did not hurt Holly in any way and believed that Tammy Mock killed Holly. (Id. at 736:5-736:12, 739:1-739:4). Counsel concluded his closing argument by reminding the jury that Jacobs admitted causing Tammy Mock's death but denied causing Holly's death. (Id. at 745:20-746:4).

Jacobs argues alternatively that counsel's ineffective assistance invalidates his conviction for murdering Holly because expert testimony regarding his mental disorders and defects would have corroborated his testimony that he lashed out in a rage after finding Holly dead in the bathtub. This, he believes, would have supported his testimony that he did not kill Holly. Whether the evidence would have supported his version of the facts, however, is not the relevant inquiry. We must examine his argument in light of his specific claim that trial counsel rendered ineffective assistance by failing to present such evidence. Under Strickland, we must determine whether there is a reasonable probability that the result of the proceeding would have been different if the jury had heard expert testimony regarding his mental disorders. See Strickland, 466 U.S. at 694. In light of Delois' two statements that Jacobs admitted killing Holly, we cannot find a reasonable probability that the jury would have acquitted Jacobs of Holly's murder if the jury had heard expert testimony regarding his mental disorders.

For these reasons, we will reverse the District Court's decision denying federal habeas relief as to Jacobs' claim of ineffective assistance of counsel at the guilt phase in failing to investigate and present evidence of mental disorders, but only as

29

to Jacobs' conviction for the first degree murder of Tammy Mock. We will remand to the District Court with instructions to grant the writ conditioned upon the Commonwealth providing Jacobs a new trial on the charge of murdering Tammy Mock.

**B. Challenges to Jacobs' Conviction for the Murder of Holly Jacobs Based on Pennsylvania's <u>Corpus</u> <u>Delicti</u> Rule**

Jacobs' next claim is based on Pennsylvania's <u>corpus delicti</u> rule and its application to his mother's pretrial statements that he admitted in telephone conversations that he killed his baby Holly. Jacobs alleges that the trial court violated his federal right to due process by failing to instruct the jury in accordance with state law on the Commonwealth's burden of proof to establish the <u>corpus</u> <u>delicti</u> of Holly's murder before considering his out-of-court admissions. He also alleges that counsel rendered ineffective assistance in violation of the Sixth Amendment by failing to object to the <u>corpus</u> <u>delicti</u> jury instruction. He further asserts that the evidence apart from his out-of-court admissions is insufficient to establish the <u>corpus delicti</u>.

According to Pennsylvania's <u>corpus delicti</u> rule,[12] before introducing a criminal defendant's out-of-court admission, "the Commonwealth must establish by independent evidence that a crime has in fact been committed." <u>Commonwealth v. Reyes</u>,

_____

[12]Translated literally, <u>corpus delicti</u> means "the body of a crime." Black's Law Dictionary 344 (6th ed. 1990).

681 A.2d 724, 727 (Pa. 1996). A defendant's confession "is not evidence in the absence of proof of the corpus delicti." Commonwealth v. Taylor, 831 A.2d 587, 590 (Pa. 2002) (internal quotations omitted). In a murder prosecution, the corpus delicti consists of evidence that an individual is dead and that the death resulted from criminal means. Commonwealth v. Tallon, 387 A.2d 77, 80 (Pa. 1978).

The Pennsylvania Supreme Court has described the application of the rule as a "two-tiered approach" having a "dual level of proof." Reyes, 681 A.2d at 728. The first tier pertains solely to the admissibility of the defendant's out-of-court confession. Id. at 727. At this stage, the trial court must determine whether the Commonwealth has established by a preponderance of the evidence (apart from the confession) that a crime has in fact been committed.[13] Id. at 727-28. Once the trial court admits the confession, the jury may not consider the confession unless the Commonwealth proves the corpus delicti beyond a reasonable doubt. Id. at 728; Tallon, 387 A.2d at 81.

Because Jacobs' claim actually consists of three related but separate claims, he must show that he exhausted each of

---

[13]Jacobs makes clear that he does not challenge the admissibility of his out-of-court statements to his mother. (Reply Br. at 10-11).

them.[14]  In his PCRA petitions,[15] Jacobs does not mention the corpus delicti rule at all.  In his brief on PCRA appeal, however, Jacobs argues that the trial court misapplied the corpus delicti rule and wrongly admitted his out-of-court statements, that the trial court failed to instruct the jury properly on the corpus delicti rule, and that all previous counsel were ineffective for failing to object to the trial court's actions and failing to pursue the matter on direct appeal or in PCRA proceedings.

Apparently, the Pennsylvania Supreme Court overlooked Jacobs' challenge based on the trial court's corpus delicti instruction.  Plainly, the Pennsylvania Supreme Court addressed the merits of Jacobs' assertion that "trial counsel and PCRA counsel were ineffective in not raising the trial court's failure to

---

[14]Unfortunately, the Commonwealth does not address fully whether these claims are properly exhausted.  The Commonwealth reads these claims in part as challenging the trial court's admission of Jacobs' statements to his mother, and asserts that it is not cognizable as an issue of state law. (Appellees' Br. at 28-29).  The Commonwealth also reads these claims as challenging counsel's failure to object to the admission of the evidence, and argues that it is exhausted but without merit because Jacobs' statements were properly admitted.  It appears that the Commonwealth concedes that Jacobs exhausted his challenge to the jury instruction on the corpus delicti rule.

[15]Jacobs filed a pro se PCRA petition, which counsel subsequently supplemented.

32

apply the corpus delicti rule regarding the death of Holly Jacobs." Jacobs II, 727 A.2d at 552. The Pennsylvania Supreme Court also addressed whether "the trial court erred in permitting into evidence the statements of [Jacobs'] mother relating to [his] confessed killing of Holly Jacobs where there was no independent evidence to establish that Holly Jacobs died as a result of anything other than an accident." Id.

Nowhere in its opinion does the Pennsylvania Supreme Court specifically mention the trial court's instruction to the jury regarding corpus delicti or counsel's failure to object to it. Significantly, the Pennsylvania Supreme Court specifically found certain claims waived for failure to present them to the PCRA court – Jacobs' challenge to the jury instructions on corpus delicti is not mentioned in the list of waived claims. Id. at 550 & n.9. In other words, although Jacobs presented his jury instruction challenge, the Pennsylvania Supreme Court neither addressed it nor found it waived. We can only conclude that the Pennsylvania Supreme Court overlooked this aspect of Jacobs' corpus delicti claim.

We must also conclude that the Pennsylvania Supreme Court would not have deemed this claim waived – that court considered on the merits several other claims in precisely the same posture.[16] Because no state court has issued a decision on

_____

[16]Alternatively, for reasons discussed infra in section III.D, Pennsylvania's application of its waiver rule in capital cases on PCRA appeal is not an adequate state procedural rule for purposes of determining whether this claim is procedurally

33

Jacobs' due process challenge to the jury instructions, the deferential standards of review of § 2254(d)(1) do not apply. See Everett, 290 F.3d at 508. Rather, we review this claim de novo. See Appel, 250 F.3d at 210. Even so, for the following reasons, the District Court correctly concluded that these claims do not warrant granting federal habeas relief.

### 1. Jury Instruction on Corpus Delicti

Under Pennsylvania law, the jury cannot consider a defendant's out-of-court admission unless the jury first finds that the Commonwealth established the corpus delicti beyond a reasonable doubt. See Reyes, 681 A.2d at 728. The federal Due Process Clause in turn protects a criminal defendant against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. In re Winship, 397 U.S. 358, 364 (1970). The Due Process Clause also requires that the jury be instructed on the necessity of proof beyond a reasonable doubt. Cool v. United States, 409 U.S. 100, 104 (1972). On federal habeas review, the relevant question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process . . . , not merely whether the instruction is undesirable, erroneous, or even universally condemned." Martin v. Warden, Huntingdon State Correctional Inst., 653 F.2d 799, 809 (3d Cir. 1981) (alteration in original) (quoting Henderson v. Kibbe, 431 U.S. 145, 154 (1977) and Cupp v. Naughton, 414 U.S. 141, 146-47 (1973)). "'[A] single instruction to the jury may not be

barred under federal habeas law.

34

judged in artificial isolation but must be viewed in the context of the overall charge.'"  Martin, 653 F.2d at 809-10 (quoting Cupp, 414 U.S. at 146-47).

Here, Jacobs contends that the trial court violated his right to federal due process by failing to instruct the jury that it must find the corpus delicti beyond a reasonable doubt before considering his out-of-court confessions, as required by state law.  A review of the instruction as it pertains specifically to Jacobs' confessions reflects that the charge was not perfect.  The trial court spent four transcript pages of the 44-page charge discussing "special rules" that apply when considering a defendant's confession:

> In this case, the Commonwealth is presenting the testimony of the Defendant's mother in the belief that it is a confession, an admission, by him that he committed these crimes, and there are special rules that apply to confessions.

> The Commonwealth has introduced evidence of a statement which it claims was made by the Defendant. Before you consider the statement as evidence against the Defendant you must find, first, that a crime in fact was committed; second, that the Defendant in fact made the statement; and third, that the statement was voluntary. Otherwise, you must disregard the statement.

35

Each juror should ultimately decide these questions for himself and thereby individually accept or reject the Defendant's statement as evidence. You must not allow the fact that I admitted the statement into evidence to influence you in any way during your deliberations. . . .

Now to get back to confessions. There does not appear to be a great deal of dispute that a crime was in fact committed, at least in regard to the death of Tammy Mock. Now that doesn't – my saying that doesn't make it a fact. Nothing is a fact in the case until you as jurors determine it to be a fact, but in the arguments of counsel, that was what I understood defense counsel to indicate. That's the only reason I'm saying that. But that's something for you to determine when you get out to the jury room. . . .

So it appeared to the Court that the specific issue that you would have to focus on in this particular area is that the Defendant in fact made the statement. And in that regard, what you want to focus on in particular is was [sic] his actual words as he spoke them repeated to you. In other words, did he say that exact thing? And, of course, there's been some varied testimony in regard to that. You've heard the statement from the witness on the stand, the mother. You've heard statements that she made on earlier occasions and her reasons as to why there is a distinction between the two, and you've also heard the Defendant say what his version of his statement or conversation was to his mother.

36

> So you're going to have to work out if it's been proven
> to you beyond a reasonable doubt what his exact words
> were, and if you're satisfied as to what the exact words
> were, then you may consider that along with finding that
> a crime has been committed and that the statement was
> voluntary.

(Trial Tr., Vol. V, 9/18/92 at 786:20-789:20).

Jacobs argues that the trial court's charge is constitutionally infirm because it omitted any reference to the Commonwealth's burden of proving the corpus delicti beyond a reasonable doubt, failed to distinguish between the deaths of Tammy and Holly, and "all but directed a verdict on the corpus delicti issue." (Appellant's Opening Br. at 40-41). While Jacobs' criticisms of this portion of the charge are not entirely unfounded, it is apparent that he has neglected to examine the charge as a whole – rather, he has isolated the portion of the charge as it relates specifically to confessions and essentially excluded consideration of the remaining forty pages of the charge.

In the charge, the trial judge referred numerous times to the Commonwealth's burden to prove each and every element of the crime beyond a reasonable doubt. Never did the trial court suggest any other burden of proof or that Jacobs bore any burden whatsoever. Based on the charge as a whole, we find it extremely unlikely that the jury perceived that the Commonwealth's burden was ever less than beyond a reasonable doubt. Additionally, the trial judge specifically instructed the jury that the murder of Tammy and the murder of

37

Holly required individual findings:

> And as always, there's [sic] going to be two separate findings, first that Tammy Mock is dead and second that Holly Jacobs is dead, and I won't repeat that each time. Please assume that applies to everything I'm going to say. You'll have two separate findings for each one.

(Id. at 804:7-804:12).

To the extent that Jacobs argues that the trial court "all but directed a verdict," this contention also lacks support based on an examination of the charge as a whole. In its general instructions, the trial court charged the jury:

> Now, how do you make that decision? Well, in effect you, collectively, are the judge of the facts. In effect, there's [sic] two judges in the case. I'm the judge for the law and you must follow the law as I am now going to give it to you, but you are the judges of the facts and it's totally up to you to determine exactly what happened and what's been proved by the Commonwealth and whether it meets their burden and the verdict that flows from that after you apply the law to the facts as you find them.

(Id. at 779:11-779:21).

Moreover, the trial court specifically reminded the jury of its duty to determine the facts regarding Jacobs' confession: "Each juror should ultimately decide these questions for himself and thereby individually accept or reject the Defendant's

38

statement as evidence. You must not allow the fact that I admitted the statement into evidence to influence you in any way during deliberations." (Id. at 787:9-787:14). The judge further noted that there did "not appear to be a great deal of dispute that a crime was in fact committed, at least in regard to the death of Tammy Mock . . . [but] my saying that doesn't make it a fact. Nothing is a fact in the case until you as jurors determine it to be a fact." (Id. at 788:7-788:12) (emphasis added). Contrary to Jacobs' assertions, the trial court did distinguish the death of Tammy from that of Holly, and did not express an opinion whether a crime had been committed as to Holly.

Notwithstanding the adequacy of the instructions as a whole, Jacobs relies on Commonwealth v. Ahlborn, 657 A.2d 518 (Pa. Super. Ct. 1995), for the proposition that Pennsylvania law requires the trial court to specifically charge the jury to find the corpus delicti beyond a reasonable doubt. In Ahlborn, the trial court charged the jury that prior to considering the confession, it must find that a crime had, in fact, occurred. Id. at 521-22. According to the Superior Court, such an instruction failed to convey the reasonable doubt standard and essentially diluted the Commonwealth's burden of proof. Id. at 522. According to Jacobs, the trial court's failure to instruct the jury in compliance with Ahlborn violated his federal right to due process.

Ahlborn supports the conclusion that the trial court must, as a matter of state law, specifically charge the jury to find the corpus delicti beyond a reasonable doubt, even if the trial court has correctly instructed the jury as to the Commonwealth's overall burden. Nothing in Ahlborn suggests, however, that the

39

trial court's instruction violated the federal Due Process Clause. <u>Ahlborn</u> examines only a single paragraph in the instruction regarding the defendant's confession without considering the overall instructions.  <u>Id.</u> at 520-22.  Such an analysis does not comport with the well-established principle of federal law that a single instruction must be viewed in light of the overall charge.  <u>See</u> <u>Cupp</u>, 414 U.S. at 146-47.  Therefore, <u>Ahlborn</u> does not and should not govern whether the trial court's <u>corpus delicti</u> instruction violated Jacobs' constitutional right to due process.[17]  The District Court properly rejected this claim on the merits.

## 2. Ineffective Assistance of Counsel for Failure to Object to Jury Instructions

Jacobs' related claim is that trial counsel rendered ineffective assistance by failing to object specifically to the <u>corpus delicti</u> instruction.  To the extent that this claim is based on counsel's failure to object as a matter of federal law, this claim is without merit.   For the reasons set forth previously, Jacobs cannot show a reasonable probability that the outcome of the proceeding would have been different if counsel had

---

[17]We note also that <u>Ahlborn</u> was a direct appeal of a criminal conviction.  The burden of demonstrating that an erroneous instruction was so prejudicial as to support a federal collateral attack on a state court judgment is greater than that required to establish error on direct appeal.  <u>See</u> <u>Martin</u>, 653 F.2d at 809.

objected based on the federal Due Process Clause.

Whether counsel rendered ineffective assistance by failing to object to the corpus delicti charge under state law is a separate question. As described previously, Ahlborn suggests that the trial court must specifically charge that the Commonwealth must prove the corpus delicti beyond a reasonable doubt before the jury can consider an out-of-court admission. Significantly, the corpus delicti instruction at issue in Ahlborn is similar to the one given at Jacobs' trial; the trial court in each case instructed the jury that it had to find "that a crime in fact" was committed. Ahlborn holds that such an instruction essentially dilutes the Commonwealth's burden of proof.

We cannot end our inquiry here, however, because both the Pennsylvania Supreme Court and the District Court ruled that the Commonwealth was not required to prove the corpus delicti of Holly's murder under the closely related exception to the corpus delicti rule. As the Pennsylvania Supreme Court has explained:

> This exception comes into play where an accused is charged with more than one crime, and the accused makes a statement related to all the crimes charged, but the prosecution is only able to establish the corpus delicti of one of the crimes charged. Under those circumstances where the relationship between the crimes is sufficiently close so that the introduction of the statement will not violate the purpose underlying the corpus delicti rule, the statement of the accused will be admissible as to all the

41

crimes charged.

Commonwealth v. Bardo, 709 A.2d 871, 874 (Pa. 1998).

We agree that the closely related exception applies here. There is no question that the Commonwealth established the corpus delicti of Tammy Mock's murder. Jacobs himself testified in court that he killed Tammy Mock when he lost control upon discovering that she had drowned Holly. The police found the bodies of both Tammy and Holly in the bathtub several days later. Because the closely related exception applies, the trial court was not required to instruct the jury that it must find the corpus delicti of Holly's murder beyond a reasonable doubt. See id.

Jacobs counters that the closely related exception applies only to the admissibility tier of the corpus delicti rule. (Appellant's Opening Br. at 44 n.24). According to Jacobs, the Pennsylvania Supreme Court has never applied the closely related exception to the second tier of the rule. (Id.). This is incorrect. In Bardo, for example, the Pennsylvania Supreme Court expressly considered whether "the trial court erred in its instruction to the jury on the corpus delicti rule." 709 A.2d at 875. The Pennsylvania Supreme Court relied squarely on the closely related exception to conclude that the claim was "meritless." Id.

It follows that Jacobs' claim of ineffective assistance based on counsel's failure to raise a state law objection to the corpus delicti instruction must fail. If counsel had raised such an objection, there is no reasonable likelihood that the outcome

42

of the proceedings would have been any different. Likewise, if appellate counsel had raised this argument on direct appeal, it is unlikely that the Pennsylvania Supreme Court would have vacated Jacobs' conviction for Holly's murder.

### 3. Sufficiency of Evidence of Corpus Delicti

Jacobs' final claim based on the corpus delicti rule is that the evidence of Holly's murder (apart from his out-of-court admission) is insufficient to support a finding beyond a reasonable doubt that the baby was killed by unlawful means. Jacobs asserts that Holly died from drowning under circumstances equally consistent with an accident as with a crime. (Appellant's Opening Br. at 48). From this, Jacobs concludes that the Commonwealth failed to prove beyond a reasonable doubt that a crime had been committed.

The short answer to this argument is that the Commonwealth was not required to prove the corpus delicti of Holly's murder because the closely related exception applies. Even if it did not apply, this argument lacks merit. The circumstances of Holly's death are not equally consistent with an accident as with a crime. Indeed, Jacobs testified that Tammy killed Holly to get back at him, and that he killed Tammy when he lost control at finding his baby dead. No persuasive evidence was presented at trial to establish that

43

Holly's death was anything but a homicide.[18]

For these reasons, we agree with the District Court that Jacobs' claims based on the corpus delicti rule do not warrant federal habeas relief.

### C. Ineffective Assistance of Counsel for Failing to Investigate and Present Evidence of Delois Jacobs' Alcoholism

At a preliminary hearing, Delois Jacobs testified that her son had admitted to her in telephone conversations that he killed both Tammy and Holly. At trial, however, Delois testified that she had been going through some problems and was very upset when Jacobs called her, and that she could not remember whether he admitted killing Holly. (Trial Tr., Vol. III, 9/16/92 at 543:20-545:3, 549:2-551:12). Jacobs now claims that trial counsel rendered ineffective assistance by failing to investigate and present evidence that Delois had a long history of alcoholism and may have been intoxicated when Jacobs made out-of-court admissions to her.[19]

The Pennsylvania Supreme Court rejected this claim on the merits because: (1) there was no evidence that Delois was

---

[18]Common sense suggests that an infant of Holly's age did not climb into the bathtub on her own and drown accidentally.

[19]Jacobs exhausted this claim by presenting it in his PCRA petition and on PCRA appeal.

44

intoxicated at the time Jacobs confessed to her; and (2) trial counsel testified at the PCRA hearing that he did not want to undermine the credibility of Delois' trial testimony by cross-examining her regarding her alcoholism. Jacobs II, 727 A.2d at 549. According to the Pennsylvania Supreme Court, counsel had a reasonable basis for proceeding as he did and thus was not ineffective. Id. The District Court likewise rejected this claim on the merits after concluding that counsel's actions constituted sound trial strategy. Jacobs III, 129 F. Supp. 2d at 414.

We agree that this claim lacks merit. Jacobs' assertion is, at best, that his mother may have been under the influence of alcohol at the time he confessed to her. We find no evidence establishing that Delois was intoxicated or that intoxication caused her to misrepresent the content of her conversations with Jacobs. Counsel testified at the PCRA hearing that he had spoken to Delois a couple of times before trial, and that she had never mentioned the possibility of intoxication. (PCRA Hearing Tr. 5/29/97 at 39:21-39:25). At the PCRA hearing, Delois testified that she did not remember whether she had been drinking alcohol the day Jacobs confessed to her. (PCRA Hearing Tr. 6/13/97 at 16:14-16:24). In other words, Jacobs has little factual support for his assertion of ineffective assistance in this regard.

Additionally, Jacobs has failed to address how he was prejudiced by counsel's failure to discover Delois' alcoholism and potential intoxication. He does not explain how he can demonstrate a reasonable probability that he would have been acquitted of murdering Holly if counsel had attacked Delois' credibility. Delois' testimony at trial plainly favored Jacobs – if

45

counsel had attacked Delois' credibility with evidence of alcoholism, the jury could well have discounted her entire testimony, including that portion of her testimony which was favorable to Jacobs.

In short, Jacobs has fallen short of demonstrating that he is entitled to federal habeas relief as to this claim. The District Court properly rejected this claim on the merits.

### D. Ineffective Assistance of Counsel for Failing to Request Voir Dire Concerning Racial Bias

Jacobs is African-American; Tammy Mock was white. Each member of the venire panel was white. During voir dire, trial counsel did not question any prospective juror concerning racial bias. Jacobs claims that trial counsel rendered ineffective assistance during voir dire for failing to inquire about racial bias, especially where a young African-American man was on trial for murdering his white girlfriend.

The District Court declined to consider this claim. According to the District Court, this claim challenged counsel's representation at the penalty phase, not at the guilt phase. The District Court believed that it need not address the merits of this issue because the death sentence had been vacated on other grounds. Jacobs III, 129 F. Supp. 2d at 409-10.

After reviewing Jacobs' habeas petition and his reply memorandum in support filed in the District Court, we disagree

46

that this claim challenges only counsel's representation at the penalty phase. This claim challenges counsel's failure "to inquire concerning racial bias among the members of the jury, where the entire venire was white and the case involved the murder of a white female teenager and child by her African-American boyfriend." (Pet. at 26). In his reply memorandum, Jacobs alleges that "counsel ineffectively failed to inquire concerning racial bias among members of the jury." (Reply Mem. at 47). The discussion of this claim is included within the discussion of several other of counsel's alleged errors regarding voir dire. (Id. at 46-58). Jacobs concludes this discussion in the following manner:

> Counsel's numerous failures to protect Mr. Jacobs' right to be tried by an impartial jury that would decide his guilt or innocence and sentence based on the law and the facts rather than preconceived bias, prejudice, or statements made about the case outside the court created an "unacceptable risk of . . . prejudice infecting the capital sentencing proceeding," Turner v. Murray, 476 U.S. at 37, in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

(Id. at 58). To conclude that this claim challenges the death sentence, but not the underlying convictions, is unduly restrictive.

We consider next whether this claim is exhausted and thus subject to federal habeas review. According to the Commonwealth, this claim is procedurally barred because the Pennsylvania Supreme Court found it waived for failure to

47

present it to the PCRA court. (Appellees' Br. at 36-37). The Commonwealth is correct that the Pennsylvania Supreme Court refused to consider this claim on the merits after finding it waived for failure to present it to the PCRA court. Jacobs II, 727 A.2d at 548 n.5.

The fact that the Pennsylvania Supreme Court refused to consider this claim for procedural reasons does not necessarily render the issue procedurally barred on federal habeas review. A federal "habeas court 'will not review a question of federal law decided by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Szuchon v. Lehman, 273 F.3d 299, 325 (3d Cir. 2001) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). We have previously explained that a rule is adequate[20] only under the following conditions: "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." Doctor v. Walters, 96 F.3d 675, 683-84 (3d Cir.1996). In other words, a procedural rule is adequate only if it is "firmly established, readily ascertainable, and regularly followed at the time of the purported default." Szuchon, 273 F.3d at 327.

Generally, Pennsylvania's PCRA requires a petitioner to

[20]There is no question that the Pennsylvania Supreme Court's application of its waiver rule is independent from any federal question presented.

48

prove that his allegation of error has not been waived. 42 Pa. Cons. Stat. Ann. § 9543(a)(3). An issue is deemed waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding. Id. § 9544(b). Currently, the Pennsylvania Supreme Court enforces the waiver rule in capital cases on PCRA appeal, and generally deems an issue waived where the petitioner failed to present it to the PCRA court. See Commonwealth v. Albrecht, 720 A.2d 693, 700 (Pa. 1998).

Prior to Albrecht, however, the Pennsylvania Supreme Court applied the relaxed waiver doctrine in capital cases on PCRA appeal. Id. Under the relaxed waiver doctrine, the Pennsylvania Supreme Court declined to apply ordinary waiver principles in capital cases in an effort to prevent the court "from being instrumental in an unconstitutional execution." Id. On November 23, 1998, the Pennsylvania Supreme Court in Albrecht expressly abandoned the relaxed waiver doctrine in capital cases on PCRA appeal. Id. The relevant question, then, is whether Pennsylvania's strict enforcement of the waiver rule in capital cases on PCRA appeal was "firmly established, readily ascertainable, and regularly followed at the time of the purported default." Szuchon, 273 F.3d at 327.

According to the Pennsylvania Supreme Court, Jacobs waived his claim challenging counsel's failure to request voir dire regarding racial prejudice when he failed to present it to the PCRA court. See Jacobs II, 727 A.2d at 548 n.5. Jacobs initiated PCRA proceedings by filing a pro se petition on January 13, 1997, which appointed counsel supplemented on May 23, 1997. The PCRA court denied many of Jacobs' claims

49

in an oral decision rendered May 29, 1997. The PCRA court then denied all relief in a second oral decision on June 13, 1997. The Pennsylvania Supreme Court did not firmly establish its strict enforcement of the waiver rule in such cases until November 23, 1998, when it decided Albrecht, more than a year after Jacobs' PCRA petition was denied. It follows that the Pennsylvania Supreme Court's strict enforcement of its waiver rule in capital cases on PCRA appeal is not adequate to support the judgment for the purpose of finding a procedural default under federal habeas law. See Szuchon, 273 F.3d at 327. Accordingly, we are free to examine the merits of Jacobs' claim.[21]

"[A] capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." Turner v. Murray, 476 U.S. 28, 36-37 (1991). The defendant must specifically request such an inquiry. Id. at 37. "[T]he trial judge retains discretion as to the form and number of questions on" racial prejudice. Id. Here, the potential jurors were never questioned concerning racial bias because trial counsel did not request it. The specific issue, then, is whether counsel rendered ineffective assistance by failing to request such voir dire.

Under Strickland, a federal habeas court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland,

_____

[21]Because no state court has rendered a decision on the merits of this claim, we review it de novo. See Everett, 290 F.3d at 508.

50

466 U.S. at 689. The defendant bears the burden of overcoming the presumption that "the challenged action might be considered sound trial strategy." Id. (internal quotation omitted). "When counsel focuses on some issues [and excludes] others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 8 (2003). This presumption "has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." Id. at 5 (internal quotation marks and citation omitted).

Here, if Jacobs' counsel had requested voir dire respecting racial prejudice, the trial court would have been constitutionally bound to grant his request. See Turner, 476 U.S. at 36-37. Our review of the entire voir dire confirms that counsel did not ask any questions of any potential jurors regarding racial prejudice. Certainly nothing in the record suggests that Tammy Mock's killing was racially motivated. Counsel reasonably could have believed that probing the jurors' potential racial prejudices might unduly emphasize the racial differences, somehow inject racial issues into a trial where none existed, or taint the jurors' view of Jacobs and his attorney. In other words, counsel reasonably could have concluded that asking prospective jurors questions about racial prejudice would do more harm than good. Under these circumstances, and in the absence of any evidence to the contrary, we presume that counsel's decision was sound trial strategy.

Jacobs has failed to overcome this strong presumption.

51

He notes "continuing racial tensions in York" since the 2001 indictment of a former mayor for his alleged participation in the slaying of an African-American woman in 1969. (Appellant's Opening Br. at 63 n.37). He does not describe the racial climate in York at the time of his trial in 1992, nor does he explain how the racial tensions in 2001 could have impacted his trial.

Jacobs also asserts that his trial was racially sensitive because it involved an interracial sexual relationship between an African-American man and his white girlfriend. He suggests that counsel always has a duty to inquire into possible racial bias in a racially sensitive case. (Appellant's Opening Br. at 64, 66). Whether Jacobs properly characterizes his trial as racially sensitive is subject to debate.[22] Even if his trial were racially sensitive, Jacobs cites no federal authority for the proposition that the Constitution requires defense counsel to inquire into possible racial bias in each racially sensitive case.[23] Moreover,

_____

[22]To the extent that Jacobs relies on Reynolds v. Commonwealth, 367 S.E.2d 176 (Va. Ct. App. 1988), for the proposition that his case was racially sensitive, we are not persuaded. Reynolds' case was "replete with racial epithets" and "racially inflammatory evidence." Id. at 182. Our scrutiny of the record here reveals no such evidence.

[23]Jacobs cites Butler v. State, No. C.C.A. 1163, 1988 WL 63526 (Tenn. Crim. App. June 23, 1988), holding that counsel was ineffective for failing to request voir dire regarding racial prejudice. We find nothing in Butler suggesting that the Constitution requires counsel to inquire about racial prejudice in

52

we decline to adopt a rule which would require counsel to inquire as to racial prejudice, even where he reasonably deemed such questioning a poor strategic choice.

For these reasons, we conclude that Jacobs has failed to demonstrate that trial counsel performed deficiently by failing to inquire into possible racial bias on voir dire. Accordingly, his claim of ineffective assistance in this regard fails.

## IV.    CONCLUSION

For the foregoing reasons, we will reverse the District Court's order denying habeas corpus relief on Jacobs' claim of ineffective assistance of counsel during the guilt phase by failing to investigate, discover, and present evidence to support a diminished capacity defense to the murder of Tammy Mock. We will remand this matter to the District Court with instructions to enter an order granting the writ of habeas corpus conditioned on the Commonwealth's grant of a new trial, within a reasonable time, on the charge of murdering Tammy Mock. We will affirm the District Court's denial of habeas corpus relief on each of Jacobs' remaining claims.

---

each racially sensitive case, however. We note also that the Tennessee Supreme Court reversed the court of appeals' unpublished decision. See Butler v. State, 789 S.W.2d 898 (Tenn. 1990).

SCIRICA, *Chief Judge*, concurring in part and dissenting in part.

I concur with much of the Court's opinion, but I respectfully dissent as to Part III.A. In my view, the Pennsylvania Supreme Court's analysis does not constitute an unreasonable application of clearly established federal law that warrants vacating Jacobs' conviction and granting him a new trial.

Jacobs claims his trial counsel was constitutionally ineffective for failing to adequately investigate and present evidence supporting a diminished capacity defense. More specifically, he argues that the affidavits of Drs. Kessel and Fleming– each of whom performed psychiatric examinations of Jacobs for his state collateral appeal– establish that his trial counsel's efforts to obtain expert testimony were so deficient and prejudicial as to rise to the level of constitutional ineffectiveness.

The District Court found trial counsel not ineffective on the guilt phase.[24] Because I believe the District Court properly applied the standards of the Antiterrorism and Effective Death

---

[24]Because the District Court dismissed this claim based solely on a review of the state court records– without conducting its own evidentiary hearing– our review is plenary. *Marshall v. Hendricks*, 307 F.3d 36, 50 (3d Cir. 2002) (citing *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001)).

Penalty Act of 1996 ("AEDPA"),[25] I would affirm.

## I. Discussion

As the Court notes, the relevant inquiry here is whether the Pennsylvania Supreme Court's decision involved an "unreasonable application" of clearly established federal law.[26]

---

[25]The Pennsylvania Supreme Court addressed this claim on the merits on PCRA appeal. *See Commonwealth v. Jacobs*, 727 A.2d 545, 548-49 (Pa. 1999). Thus, we apply the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), P.L. 104-132, 110 Stat. 1214., 28 U.S.C. § 2254(d); *see also Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (deferential standards provided by the AEDPA apply only to those claims adjudicated on the merits in state court proceedings). Under the AEDPA, a petitioner is entitled to habeas relief only where the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1).

[26]The applicable federal law in this instance is the well-settled two-prong test established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland,* in order to merit habeas relief based on a claim of ineffective assistance of counsel petitioner must demonstrate that: (1) his attorney's performance was deficient, and (2) he was prejudiced by this deficiency. *Strickland,* 466 U.S. at 687.

55

A state court decision involves an "unreasonable application of federal law" under 28 U.S.C. § 2254(d)(1) where it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*,

---

To demonstrate deficiency, petitioner must establish that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. To overcome the presumption that counsel was effective, petitioner bears the burden of establishing that counsel's performance was unreasonable under "prevailing professional norms." *Id.* at 688. "In evaluating counsel's performance, we are 'highly deferential' and 'indulge a strong presumption' that, under the circumstances, counsel's challenged actions 'might be considered sound . . . strategy.'" *Buehl v. Vaughn,* 166 F.3d 163, 169 (3d Cir. 1999) (citing *Strickland,* 466 U.S. at 689). To show prejudice, petitioner must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687.

Ultimately, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* Put differently, "the issue is not what conduct is 'prudent or appropriate, but only what is constitutionally compelled.'" *Rompilla v. Horn*, 355 F.3d 233, 246 (3d Cir. 2004) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)), *cert. granted* 125 S. Ct. 27 (2004). Indeed, the Sixth Amendment does not require perfection; instead, it "simply . . . ensure[s] that criminal defendants receive a fair trial." *Id.* (quotations omitted).

56

529 U.S. 362, 407-08 (2000). For a federal court to find a state court's application of law unreasonable, "the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Id.* at 521 (citing *Williams*, 529 U.S. at 409). As the Supreme Court has stressed, "an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

The Pennsylvania Supreme Court evaluated petitioner's claim as follows:

> Next, Appellant maintains that trial counsel was ineffective in failing to adequately investigate and present evidence supporting a diminished capacity defense. The PCRA court rejected this assertion as the record clearly revealed that trial counsel pursued such a defense on behalf of Appellant.
>
> Specifically, trial counsel testified at the PCRA hearing regarding his efforts in this regard. He stated that initially when he suggested to Appellant that a psychiatric evaluation should be conducted, Appellant rejected the idea claiming his sanity. Trial counsel stated that he was able to convince Appellant to submit to a psychiatric evaluation and that he arranged for such evaluation to be performed. Following this examination, trial counsel was contacted by the examining psychiatrist and told that, in his opinion, Appellant was sane and knew what he

57

was doing at the time of the alleged crimes. Counsel, therefore, told the psychiatrist not to issue a report and he was not called to testify at trial.

Nevertheless, consistent with Appellant's trial testimony, trial counsel pursued a diminished capacity defense in regards to the killing of Tammy Mock. Appellant testified at trial that he was not responsible for Holly Jacobs' death. He stated that when he handed Holly Jacobs to Tammy Mock, who was in the bathtub, Mock drowned Holly. Appellant testified that after this incident occurred, he 'lost it' and killed Tammy Mock. Given this admission, trial counsel argued that Appellant was incapable of forming a specific intent to kill given his mental state at the time of the killing.

Based on the results of the psychiatric evaluation, and given Appellant's trial testimony, it is clear that trial counsel did investigate and pursue a diminished capacity defense on behalf of Appellant to the best of his ability. Accordingly, as trial counsel had a reasonable basis for proceeding as he did, he cannot be deemed ineffective.

*Commonwealth v. Jacobs*, 727 A.2d at 548-49.

Like the District Court, I believe this analysis does not constitute an unreasonable application of federal law. In my view, the Court has undertaken *de novo* review, conducting its own independent application of *Strickland* rather than focusing

58

its review on an analysis of whether the state court's application of that test was reasonable under controlling and clearly established law. A habeas petitioner, however, "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell*, 535 U.S. at 698-99 (citing *Williams*, 529 U.S. at 411).

The Pennsylvania Supreme Court's conclusion that trial counsel did not render ineffective assistance was a reasonable application of *Strickland.* Testimony at the PCRA hearing established that trial counsel ordered a psychiatric evaluation for Jacobs. Despite Jacobs' initial reluctance, trial counsel arranged an examination with Dr. Robert Davis, who examined petitioner "to determine if he had a major mental illness or other impairment that would render him incompetent to stand trial or that would negate or reduce his criminal responsibility." Dr. Davis was aware, specifically, of counsel's intent to present a diminished capacity defense, and he was provided with the police report detailing the allegations underlying the offense. Dr. Davis found no evidence of mental illness and orally informed trial counsel that, in his opinion, Jacobs suffered no psychiatric illness, knew what he was doing at the time of the alleged murders and was sane.

Relying on Dr. Davis' opinion, trial counsel did not request a written report. As intended, counsel presented a

59

diminished capacity defense at trial.[27]   Highlighting Jacobs'
testimony that he "lost it" and killed Tammy Mock because she
had drowned his daughter Holly Jacobs, trial counsel argued to
the jury that Jacobs' mental state rendered him incapable of
forming a specific intent to kill at the time of Mock's death.

This record supports the state court's conclusion.
Accordingly, I would find that the Pennsylvania Supreme Court
applied *Strickland* reasonably in concluding that trial counsel's
investigation and presentation of a diminished capacity defense
did not constitute ineffective assistance of counsel.

The Court places great weight on the Pennsylvania
Supreme Court's apparent disregard of trial counsel's failure to
provide Dr. Davis with several "highly relevant facts" and other
information "necessary . . . to conduct a proper evaluation."
This appears to include trial counsel's failure to provide Dr.
Davis with additional background information and his failure to
ask petitioner's mother, during her interview, about her son's
mental health background.

*Strickland* requires a reviewing court to consider the
totality of the circumstances, but I believe the state court's
analysis did just that.  Significantly, Dr. Davis did not state that
he was incapable of forming a conclusion on the information
available to him and the results he obtained through the
psychiatric examination.  As the District Court noted, the record

---

[27]It bears noting that a diminished capacity defense under
Pennsylvania law is "extremely limited" in scope.
*Commonwealth v. Cuevas*, 832 A.2d 388, 393 (Pa. 2003).

revealed no request by Dr. Davis for background information beyond that provided by counsel. Nor was there any reason that, after receiving the doctor's opinion, counsel would have been on notice to track down medical records or to pursue other inquiries that might possibly relate to Jacobs' mental health.

The right to counsel "does not require that a criminal defense attorney leave no stone unturned and no witness unpursued." *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996). With the benefit of hindsight, petitioner now argues that trial counsel might have been able to present psychiatric testimony at trial suggesting Jacobs suffered from mild mental retardation, organic brain damage, or cognitive impairments. The test for ineffectiveness, however, "is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is . . . whether what counsel did was within the wide range of reasonable professional assistance." *Rompilla*, 355 F.3d at 246 (citations omitted).

Like the PCRA Court, the Pennsylvania Supreme Court, and the District Court, I believe trial counsel's decisions to arrange a pyschiatric examination, rely on the professional opinion of Dr. Davis, and present a diminished capacity defense supported by Jacobs' testimony, are not constitutionally defective. Furthermore, I believe the Pennsylvania Supreme Court reasonably applied *Strickland* in reaching this conclusion. For these reasons, I would affirm the District Court's denial of petitioner's ineffective assistance claim regarding trial counsel's failure to investigate and present a diminished capacity defense

61

at the guilt phase.[28]

------

[28]Until now, no court has addressed the prejudice prong of *Strickland* at the guilt phase. The doctors' testimony by affidavit was only presented for the first time in Jacobs' PCRA appeal before the Pennsylvania Supreme Court. Because the Pennsylvania Supreme Court found trial counsel's performance constitutionally adequate at both the guilt and penalty phases, it did not consider the affidavits under either prejudice prong of *Strickland*. The District Court also found trial counsel not ineffective on the guilt phase, and thus did not address *Strickland*'s prejudice prong on the first degree murder verdict.

The affidavits of Drs. Kessel and Fleming, therefore– the evidence upon which this Court relies in concluding there exists a reasonable probability that the jury, had it heard testimony from these two doctors, would have found Jacobs guilty of third degree murder rather than first degree murder– have never been factually contested in any court. In my view, vacating the conviction is inappropriate where the issue of prejudice has never been engaged on the verdict of first degree murder. At most, then, this case should be remanded to the District Court to consider prejudice at the guilt phase of the trial.

62